IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Rosalia Choice, ) | Civil Action No. 6:13-479-TMC-KFM |
|       Plaintiff, ) | |
|     vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| Thyssen Krupp Industrial Services NA, ) Inc., ) | |
|       Defendant. ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 107) and motion to strike portions of the plaintiff's affidavit (doc. 124). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

The plaintiff filed this case in state court on January 22, 2013. On February 21, 2013, this case was removed from Greenville County Court of Common Pleas based on federal question jurisdiction. The plaintiff filed an amended complaint on February 28, 2013 (doc. 6). In her amended complaint, the plaintiff raised claims against the defendant for employment discrimination based on her sex in violation of the Equal Pay Act ("EPA"); failure to pay overtime under the Fair Labor Standards Act ("FLSA"); and diversion of wages under the South Carolina Payment of Wages Act ("SCPWA"). On February 3, 2014, the plaintiff filed an amended and supplemented complaint with the consent of the defendant (doc. 70). The amended and supplemented complaint alleges an additional cause of action for retaliation for exercising rights under the EPA.

## FACTS PRESENTED

The defendant has a warehouse located in Spartanburg, South Carolina from which it ships, processes, and stores automotive parts for its various customers (doc. 107-6,

Ian Gardner aff. ¶ 3). BMW is one of the defendant's major customers. The defendant performs containment and quality control work for parts that may have quality issues on-site at BMW's Greer, South Carolina plant (*id.* ¶ 4).

From May 2011 through June 2011, the plaintiff worked at the defendant's warehouse as a temporary employee through a temporary staffing agency, Express Employment (doc. 107-2, pl. dep. I 51). She worked as a team leader (*id.*). In July, still as a temporary employee, the plaintiff was moved to work at the BMW plant as a team leader (doc. 119-2, pl. aff. ¶ 2). Prior to working as a temporary employee at the defendant's warehouse, the plaintiff had been unemployed since November 2010 after being terminated from her job at W.W. Grainger (doc. 107-2, pl. dep. I 42-43).

On September 19, 2011, the defendant offered the plaintiff a team leader position for its "containment business" that was "based in our location in and around the Greenville, South Carolina area" with "the initial pay rate of $16.00 per hour" (*id.* 60; doc. 107-8, 9/19/11 emp. letter). Initially, when the plaintiff began her employment on October 1, 2011, she worked on-site at two customers; BMW and Gestamp (doc. 107-2, pl. dep. I 61). In late 2012, after the plaintiff's assignment ended at Gestamp, she worked only at BMW (*id.*). As a team leader, the plaintiff supervised a team of inspectors who inspected the customer's parts for quality issues.

On September 30, 2011, the day before beginning her employment with the defendant, the plaintiff sent an email to the defendant's director of quality containment, Ian Gardner, and the defendant's human resource manager, Michelle Romick, stating that she was "deeply concerned" about "the difference in pay between me and the other leads," whom she identified as Ramon Carela, Sihpomina Walker, and Juan Moore (doc. 107-9, email; doc. 107-3, pl. dep. II 118-19). In response to her email, Romick scheduled a phone call with the plaintiff and Gardner (doc. 107-10, Michelle Romick aff. ¶ 3). During their call[1]

---

[1] During the first day of her deposition, the plaintiff testified that she recorded that conversation; a fact she had not previously disclosed in her discovery responses. Pursuant to agreement of counsel, her deposition was then terminated so the plaintiff could produce

with the plaintiff, Romick and Gardner explained that the difference between her pay and that of Carela and Walker was based upon their relative skills, experience, and employment history (*id.*). Carela had multiple years of experience in quality inspection and most importantly as a Class A metal finisher with experience working on the BMW X5 line (doc.107-6, Gardner aff. ¶¶ 7-8). When the defendant offered him a team leader job on July 12, 2011, Carela was then employed as a project coordinator at a competitor, 2AM Group, being paid $20 per hour (*id.*). The defendant had to match his then $20 per hour pay rate to get him to come work there (*id.*).

On August 23, 2011, the defendant offered Walker the job of second shift team leader at the rate of $17 per hour (*id.* ¶ 9). Walker was then employed at Faurecia Interior Systems assembling seats for BMW (*id.*). According to his employment application, Walker had been employed at Faurecia since July 2007 and had extensive experience as an aircraft hydraulic systems supervisor in the U.S. Air Force Reserve (*id.*). To get Walker to leave his job at Faurecia, and based on his experience and skill set, the defendant offered him starting pay at $17.00 per hour (*id.*).

When the plaintiff complained about her pay, her then third comparator, Juan Moore, was being paid $14.00 per hour as a team leader, which was less than the plaintiff's hourly rate (doc. 107-10, Romick ¶ 4). At the time, the defendant had another male team leader working in Greenville, South Carolina who was paid less than the plaintiff, Stephen Miller. Miller was offered a team leader job on August 15, 2011, with starting pay at $15.00 per hour (*id.*).

Before working at the defendant's facility, the plaintiff testified that her metal finishing experience was (1) at Fisher-Barton in 2001 doing "stainless steel buffing," (2) while working as a temporary employee at Magna, and (3) "a little bit" as a temporary

---

a copy of the recording (doc. 107-2, pl. dep. I 102-103). The plaintiff never produced the recording. The plaintiff claimed the conversation was on a tape recorder that she provided to her attorney (doc. 30-1, pl. aff.). However, when the plaintiff's attorney sent the recorder to Legal Eagle, the recording could not be found. That disappearance was the subject of the defendant's motion for sanctions for spoliation (doc. 28). After a hearing on December 9, 2013, the undersigned recommended that the motion for sanctions be granted to the extent the plaintiff would be precluded from presenting any evidence at trial regarding the recording of the conversation and that the motion be denied in all other respects (doc. 56). On June 10, 2014, the Honorable Timothy M. Cain, United States District Judge, adopted this recommendation (doc. 75).

employee at Faurecia (doc. 107-2, pl. dep. I 18-20, 44).  The plaintiff's resume indicated that she was a "stainless steel buffer/resistance welder" at Fisher-Barton from December 2001 to February 2003, and there she "operated an industrial stainless steel buffing machine to remove discoloration from welded truck components for cosmetic purposes" and "inspected the finished product for compliance with company standards" (doc. 107-7, pl. resume).  The plaintiff testified in her affidavit that during her interview with Gardner, they discussed her "approximately two years of class A metal finishing and quality control experience at Fisher Barton and at Aerotek/Inprax" (doc. 119-2, pl. aff. ¶ 1).

In January 2013, the plaintiff's pay was increased to $16.75 per hour (doc. 107-2, pl. dep. I 88).

As a team leader assigned to BMW, the plaintiff supervised a team of inspectors who performed quality control work and were usually temporary employees (doc. 107-6, Gardner aff. ¶ 5).  To allow her to work on-site at its facility, BMW issued the plaintiff an access badge (doc. 107-3, pl. dep. II 52; doc. 107-4, pl. dep. III 94; doc. 107-6, Gardner aff. ¶ 6).  The defendant's employees working at BMW were subject to BMW's rules of conduct (doc. 107-3, pl. dep. II 146; doc. 107-4, pl. dep. III 26-27).  In late August 2013, the defendant's containment administrator, Aimee Beaudoin, informed the plaintiff and Ramon Carela by email about BMW's expectations, which she explained included that they "[m]ust work together as a unified team all attitudes or personality issues are to be left at the door and we must work together effectively.  Our customer should not know if any of our team members do not like each other.  We must show that we all get along and work as one team" (doc. 107-6, Gardner aff. ¶ 12; doc. 107-6 at 21).

Throughout early fall 2013, the plaintiff had numerous issues and run-ins with temporary employees as they worked together at BMW, including Brandon Johnson, Sherry Martinez, Robert Simmons, Willie Pearl Watt, Tiffany Crosby, Sharon Stripling, Serena Williams, and Kendrick Underwood (doc. 107-4, pl. dep. III 28-31, 35, 37-39, 48-50, 58-60). The plaintiff stated in her deposition that she "didn't have a group of angels working for me" (*id.* 49).

Beginning in July 2013, the plaintiff recorded more than a hundred conversations with numerous employees of the defendant, temporary employees, and

4

BMW employees using an application on her cell phone (doc. 107-3, pl. dep. II 145). The plaintiff "made it a habit to record" all her conversations with fellow team leader Ramon Carela "because he always lied about her" (doc. 107-4, pl. dep. III 77). According to the plaintiff, she did not have a good relationship with Carela for some time (doc. 107-3, pl. dep. II 143). The plaintiff testified in her affidavit that her supervisor, Joe Scruggs, mentioned that he had heard that she was recording conversations with co-workers (doc. 119-2, pl. aff. ¶ 7). The plaintiff stated that she told Scruggs she had recorded phone conversations she had with him and other co-workers, and Scruggs stated that he had no problem with this (*id.*).

On Friday, October 18, 2013, the plaintiff emailed Scruggs a recording of a telephone conversation she had the day before with Carela (doc. 107-3, pl. dep. II 143-44; doc. 107-12, email). In her email, the plaintiff wrote that Carela "constantly lies on me" and that he "is like a cancer the company is allowing it to spread instead of cutting it out" (doc. 107-12, email). The plaintiff admitted in her deposition that she recorded the telephone conversation with Carela while he was working inside at BMW and while she was in BMW's parking lot (doc. 107-3, pl. dep. II 143; doc. 107-4, pl. dep. III 77).

On Monday, October 21, 2013, Scruggs notified BMW that the plaintiff was recording conversations (doc. 107-4, pl. dep. III 88). As a result, on October 23, 2013, BMW informed the defendant that it was deactivating the plaintiff's access badge and that she could not work on-site (doc. 107-10, Romick aff. ¶ 5). The plaintiff was then instructed not to report to BMW (doc. 107-4, pl. dep. III 91). The plaintiff testified in her affidavit that she was told she was suspended for two weeks, but she was not told why she was suspended, and Scruggs would not return her telephone calls (doc. 119-2, pl. aff. ¶ 8). On November 1, 2013, Romick sent the plaintiff an email stating that "[a]s previously explained to you," she was "placed on paid administrative leave" because "the customer indicated that you were no longer allowed onsite" and the "situation" was being reviewed, "including possible other work locations for you" (doc. 107-3, pl. dep. II 144-145; doc. 107-4, pl. dep. III 154-55; doc. 107-10, Romick aff. ¶ 6; doc. 107-10 at 6, email). The plaintiff was on paid administrative leave from October 23, 2013, to November 5, 5013 (doc. 107-10, Romick aff. ¶ 6).

On November 4, 2013, the defendant informed the plaintiff via a letter from Romick that she was reassigned to the defendant's Spartanburg, South Carolina warehouse as a team leader leading a team of temporary employees repacking bumpers for one of the defendant's customers, Benteler (doc. 107-10, Romick aff. ¶ 8; doc. 107-10 at 9, letter; doc. 107-4, pl. dep. III 155).  Romick's letter explained that BMW "did not want" the plaintiff "present or performing any work in its facility" because of her recording conversations (doc. 107-10 at 9, letter; doc. 107-4, pl. dep. III 154-55).  The letter further stated that "[i]n light of the issues created by your recording conversations while employed at BMW," engaging in that conduct was not acceptable and may be the subject of discipline (doc. 107-10 at 9, letter).  On November 6, 2013, the plaintiff started her warehouse assignment as a team leader.  The plaintiff's pay and benefits did not change as a result of being assigned to the warehouse (*id.*; doc. 107-3, pl. dep. II 146-47).

On November 8, 2013, the defendant's warehouse manager, Jamie Sparks, issued the plaintiff a written reprimand for being absent six times during the preceding six weeks (doc. 107-4, pl. dep. III. 120; doc. 107-13, Jamie Sparks aff. ¶¶ 7-8; doc. 107-13 at 7, reprimand).  The plaintiff had been scheduled to work on November 8th and called in stating she would be absent because her daughter's truck had "broken down" (doc. 119-2, pl. aff. ¶ 10; doc. 107-4, pl. dep. III 121, 126-27; doc. 107-13, Sparks aff. ¶ 7).  The plaintiff testified in her affidavit that the five other cited absences were for days she was scheduled to be off, she did not call in on those days, and the call-ins cited in the reprimand were fabricated (doc. 119-2, pl. aff. ¶ 10).  The plaintiff stated that at the beginning of each week, she would make her schedule based on the days that her co-worker, Jackie Thompson, wanted to be off and the expected work load (*id.*).  She further stated that she scheduled days off to minimize overtime, as she had been instructed to avoid overtime (*id.*; doc. 119-2 at 12-13, email).  The plaintiff stated that even if the five scheduled days off had been actual absences, she should have been given a verbal warning after four absences, rather than a written reprimand (doc. 119-2, pl. aff. ¶ 12).

Sparks testified in his affidavit that on November 15, 2013, at 7:30 a.m., he met with the plaintiff to explain her team leader responsibilities and expectations for the Benteler bumper repack, including that she must work with her team repacking the bumpers

6

just like the other warehouse team leaders (doc. 107-13, Sparks aff. ¶ 9).  In response, the plaintiff stated she did not have to perform that work (*id.*).  Sparks also explained the break procedure because the plaintiff was seen sitting down reading the newspaper on the warehouse floor (*id.*).  He told her that a break room was available where she could read the newspaper while on break (*id.*).  Sparks testified that while he spoke, the plaintiff took out her cell phone and started doing something with it (*id.*; doc. 107-4, pl. dep. III 143-44).  According to Sparks, the plaintiff then twice ignored his instructions to put away her cell phone and began yelling at him and continued yelling at him as he instructed her to return to work (doc. 107-13, Sparks aff. ¶ 9).

According to the plaintiff, Sparks "repeatedly expressed to [her] that [she] was supposed to be packing parts" (doc. 107-4, pl. dep. III 143).  The plaintiff testified that on November 15th, Sparks approached her with "an attitude."  He was upset, stating that he had taken a picture of her sitting down and reading the newspaper (*id.*).  The plaintiff stated that she was on her break, and Sparks responded that the plaintiff was only allowed to take her break in the break room (*id.*).  The plaintiff asked why she was the only one who could only take a break in the break room (*id.* 143-44).  The plaintiff stated that Sparks "became irate, yelling," they "went back and forth," and Sparks "started pointing in [her] face" (*id.* 144).  The plaintiff testified that she took out her phone and, while her "first instinct was to call the police," she instead called Wade Moore, who was her regional supervisor, and Michelle Romick (*id.*).  Moore took the plaintiff in his office and "got [her] statement," and they then called Romick on a conference call (*id.*).

Sparks issued the plaintiff a written warning on November 26, 2013, for engaging in disruptive activity in the work place and acts of insubordination (doc. 107-13, Sparks aff. ¶ 10; doc. 107-13 at 10, reprimand).  The plaintiff refused to sign the reprimand but wrote that the description of events was a "complete fabrication of the truth," that she "was not the one pointing [her] finger in Jamie's face," and [they] never reviewed a break procedure" (doc. 107-13 at 10, reprimand).

On January 3, 2014, Sparks requested that the plaintiff report to work.  The plaintiff testified that she had told Sparks the day before that she needed the day off (doc. 107-4, pl. dep. III 195).  After Sparks requested that the plaintiff come in to work, the plaintiff

initially told Sparks via text message that she would report around 8 a.m., but then changed the time to 10 a.m. (*id.* 195-96; doc. 107-13, Sparks aff. ¶ 11). When the plaintiff did not show up at 10:00 a.m., Sparks called her at 11:30 a.m. to ask about her whereabouts and why she had not reported (doc. 107-13, Sparks aff. ¶ 11). The plaintiff explained during their phone conversation that she called the customer, Benteler, to check whether there were any bumpers for her to pack that day (*id.*; doc. 107-4, pl. dep. III 197-98). Based on her conversation with someone at Benteler, the plaintiff decided there was not enough work for her to justify reporting to work (doc. 107-13, Sparks aff. ¶ 11; doc. 107-4, pl. dep. III 197-99). The plaintiff testified that she left Sparks a message on his voicemail telling him that she would not be in because there was no work to do (doc. 107-4, pl. dep. III 197-99). The plaintiff testified in her affidavit that Sparks told her to come in to work despite there being no work to do and that she could clean up; the plaintiff "refused to come all that way just to clean up . . ." (doc. 119-2, pl. aff. ¶ 17). While they talked, the plaintiff became angry and hung up on Sparks (doc. 107-13, Sparks aff. ¶ 11; doc. 107-4, pl. dep. III 197-99). As a result of this incident, the plaintiff was suspended for three days without pay on January 15, 2014 (doc. 107-13 at 13, suspension; doc. 107-4, pl. dep. III 197-201).

From January 28, 2014, to April 1, 2014, the plaintiff was on a leave of absence under the Family and Medical Leave Act ("FMLA") (doc. 107-4, pl. dep. III 8). Within a few hours of returning to work from her FMLA leave on April 1, 2014, the plaintiff injured her back, and she was unable to work (*id.* 11-12; doc. 107-13, Sparks aff. ¶ 14). Since that time, the plaintiff has not worked at the defendant. The plaintiff has been receiving workers' compensation benefits since May 13, 2014 (doc. 107-4, pl. dep. III 6-7).

On July 23, 2014, the plaintiff was notified that she was being temporarily laid off because her job assignment had ended, and it would be reevaluated monthly (doc. 107-5, pl. dep. IV 32). In particular, the number of bumpers being packed for Benteler had declined from 25 to 30 racks of bumpers per day, to 2 to 3 racks of bumpers per day (doc. 107-14, Dana Evert dep. 8-9; doc. 107-13, Sparks aff. ¶ 15). As a result of that decline in business, all of the temporary employees who worked with her on the Benteler job had been let go prior to the plaintiff's layoff (doc. 107-13, Sparks aff. ¶ 15). Since at least September 5, 2014, the plaintiff has been physically unable to return to her job, and her

doctor has not indicated when she might be able to return to work (doc. 107-5, pl. dep. IV 24).

## DEFENDANT'S MOTION TO STRIKE
## PORTIONS OF THE PLAINTIFF'S AFFIDAVIT

The defendant argues that several statements in the plaintiff's affidavit (doc. 119-2) submitted in support of her opposition to the motion for summary judgment should be stricken because they are conclusory or contain inadmissible hearsay (doc. 124-1). The plaintiff in *Evans v. Technologies App. & Service Co.* opposed summary judgment by submitting an affidavit "mostly made up of conclusory statements about her qualifications and the deficiencies of her colleagues." 80 F.3d 954, 959 (4th Cir. 1996). The trial court struck portions of the plaintiff's affidavit as "not based on personal knowledge," "containing hearsay statements," or "irrelevant, conclusory, or both." *Id.* at 958. The United States Court of Appeals for the Fourth Circuit found that the district court "acted properly" in striking portions of the affidavit:

> Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court. Federal Rule of Civil Procedure 56(e) [now 56(c)(4)] specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge. *See also Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991) (evidence submitted in opposition to summary judgment motion must be admissible and based on personal knowledge). Thus, summary judgment affidavits cannot be conclusory, *Rohrbough [v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 [(4th Cir. 1990)], or based upon hearsay, *Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991).

*Id.* at 962. The court further noted, "[Courts] generally consider self-serving opinions without objective corroboration not significantly probative." *Id.*

The defendant argues that paragraph 7 of the plaintiff's affidavit should be stricken because it recounts a conversation she allegedly had with fellow employee Carela, which is hearsay (doc. 119-2, pl. aff. ¶ 7). It is an out of court statement offered to prove the matter asserted therein, and it is not subject to any hearsay exception. The plaintiff offered no argument in opposition as to this issue. Accordingly, the undersigned

recommends that the statements in paragraph 7 of the plaintiff's affidavit regarding her conversation with Carela be stricken as inadmissible hearsay.

The defendant further argues that several conclusory statements in paragraphs 6, 13, 14, 19, and 25 should be stricken. Specifically, in support of her EPA claim, the plaintiff stated that she "made several follow up complaints before filing this suit" (doc. 119-2, pl. aff. ¶ 6). She does not, however, offer any details about the nature of those complaints nor when or to whom those alleged complaints were made. The defendant argues that, without more detail, it is unable to test the veracity of the plaintiff's conclusory assertion regarding follow up complaints, and, therefore, paragraph 6 should be stricken from the plaintiff's affidavit. The undersigned agrees and recommends that paragraph 6 be stricken.

The defendant argues that a portion of paragraph 13 should be stricken. Regarding the November 2013 written warning the plaintiff received for insubordination, the plaintiff testified in her affidavit that her supervisor Jamie Sparks "aggressively advanced on me, making aggressive gestures" (doc. 119-2, pl. aff. ¶ 13). The defendant contends that this statement is conclusory and contradicts her prior deposition testimony. The undersigned disagrees. In her deposition, the plaintiff testified that Sparks "became irate, yelling," they "went back and forth," and Sparks "started pointing in [her] face" (doc. 107-4, pl. dep. III 144). Accordingly, the motion should be denied in this regard.

Also regarding this November 2013 written warning, the plaintiff testified that other employees took breaks outside of the break room and used their phones in the warehouse (doc. 119-2, pl. aff. ¶ 14). The defendant argues that the plaintiff is seeking to establish the existence of a comparable for her retaliation claim but does not provide the necessary details for doing so since she does not identify a single employee who either took breaks outside of the designated break area or used their phones in the facility. Similarly, to counter the defendant's legitimate non-retaliatory reason for the plaintiff's January 2014 suspension -- insubordination -- the plaintiff testified in her affidavit that "it was common for employees to call in and announce that they would not be coming into work despite being

scheduled" (*id.* ¶ 19). The defendant argues that the plaintiff again seeks to establish the existence of a phantom comparable but fails to identify a single employee who unilaterally announced she would not be reporting to work as scheduled and that this employee was similarly situated to her. The plaintiff must establish that similarly situated employees were treated more favorably than her and that she was similar to her alleged comparators in all relevant respects. *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). To be similarly situated, the plaintiff must show that the employees "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The undersigned agrees and recommends that the statements be stricken. However, even if the statements are considered by the district court, such statements made without specific evidentiary support are too vague and conclusory to create a genuine issue of material fact to stave off the defendant's summary judgment motion. *Brown v. Flowers*, 196 F. App'x 178, 182 (4th Cir. 2006).

Finally, regarding her alleged comparator Jeff Desch, the plaintiff stated in her affidavit that Desch "provided no other duties besides the same team lead duties that I was doing" (doc. 119-2, pl. aff. ¶ 25). The plaintiff offers no admissible evidence, either from Desch or anyone else, to support this conclusory statement. As argued by the defendant, this is exactly the sort of bald assertion about her "qualifications and the deficiencies of her colleagues" that the court struck from the plaintiff's affidavit in *Evans*. 80 F.3d at 959. Based upon the foregoing, this portion of paragraph 25 should be stricken from the plaintiff's affidavit. Furthermore, even if the statement is considered, it is too vague and conclusory to create a genuine issue of material fact.

Based upon the foregoing, the defendant's motion to strike should be granted in part and denied in part as set forth above.

11

## MOTION FOR SUMMARY JUDGMENT
## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

12

***Equal Pay Act***

The plaintiff alleges in her first cause of action that the defendant paid her unequal compensation on the basis of sex in violation of the EPA (doc. 70, 2nd amend. comp. ¶¶ 15-18).  To establish a *prima facie* case under the EPA, the plaintiff bears the burden of establishing that she:  (1)  received lower pay than a male co-employee (2)  for performing work substantially equal in skill, effort, and responsibility under similar working conditions. *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995). The comparison must be made "factor by factor" with a specific male comparator; a hypothetical or "composite" male co-employee will not suffice. *Houck v. Virginia Polytechnic Inst.*, 10 F.3d 204, 206 (4th Cir. 1993).  The plaintiff "cannot rest on bare allegations" and must present evidence to support her case regarding each comparator. *Soble v. University of Maryland*, 778 F.2d 164, 167 (4th Cir. 1985).

If the plaintiff establishes a *prima facie* EPA case, the burden shifts to her employer to prove that the pay differential is justified by a statutory exception:  (1)  seniority system; (2)  merit system; (3)  a system that measures earnings by quantity or quality of production; or (4)  a differential based on any factor other than sex. *Strag*, 55 F.3d at 948 (citing 29 U.S.C. § 206(d)(1)).  If an employer can show the pay discrepancy is a result of any of those factors, the EPA "claim must fail unless the plaintiff can satisfactorily rebut the defendant's evidence." *Id*.  It is well settled that pay differences based on experience, training, or ability do not violate the EPA. *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 725 (4th Cir. 1980) (quoting H.R. Rep. No. 88-309, p. 687 (1963)).  *See also Strag*, 55 F.3d at 951 (comparator's other employment opportunities and salary at current employer properly constituted a factor other than sex)*; Ritter v. Mount St. Mary's Coll.*, 814 F.2d 986, 993 (4th Cir. 1987) (differences in qualifications constitutes a "factor other than sex"); *Maher v. Univ. of S. Carolina*, No. 10-2545, 2013 WL 394149, at *3-4 (D.S.C. Jan. 10, 2013) (comparators had significantly more professional experience than plaintiff).

In her deposition, the plaintiff identified her comparators as Ramon Carela, Sihponima Walker, and Jeff Desch (doc. 107-3, pl. dep. II 90).  The plaintiff can establish a *prima facie* EPA case with regard to Carela and Walker as she received lower pay than these male co-employees for performing work substantially equal in skill, effort, and responsibility under similar working conditions.  However, as will be discussed below, she has not rebutted the defendant's evidence that the pay differential was based on factors other than sex.  With regard to Desch, the plaintiff has not established a *prima facie* EPA case, and, even if she could, she has not rebutted the defendant's evidence that Desch was paid more based on factors other than sex.

### ***Carela***

Carela, like the plaintiff, was hired as a team leader.  However, it is undisputed that when he was offered that job on July 12, 2011, Carela was actively employed at a competitor of the defendant, working as a project coordinator for $20 per hour (doc. 107-6 at 12-13, Carela app.; doc. 107-11, Gardner dep. 15-16).  In addition, Carela's resume and employment application indicated that he had several years of recent experience as a Class A metal finisher at Magna Drive Automotive and Preferred Services (doc. 107-6, Gardner aff. ¶ 8; doc. 107-6 at 11-13, Carela resume & app.).  Moreover, Carela's Class A metal finishing experience included performing work at BMW as an assembly team lead for the BMW X5 line from 2007 to 2009 (doc. 107-6, Gardner aff. ¶ 8; doc. 107-6 at 13, Carela app.).  Gardner testified in his deposition as follows:

> Q. Now, in your earlier testimony, you said several things. As to reasons for why Mr. Carela was paid $20 an hour and why Ms. Choice was paid 16 an hour, can you tell me those reasons?
>
> A. The first reason is Ramon was a Class-A metal finisher. So it's a requirement. We need to have at least one Class-A metal finisher and Ramon has that experience. He was currently working. He had multiple years of experience in the quality inspection and as a Class-A metal finisher. He was also working  at the time when we had to basically get him to leave

14

> his current job and the number that -- the pay rate that we pay
> him is what it took to get him to come on board. That was a
> match in pay at that point for Ramon.

(Doc. 119-3, Gardner dep. 35).  Further, based on the fact that Carela "was currently working at the time [the defendant] recruited him," his "skill-set," including his expertise as a metal finisher, and the need to match his pay at his current employer, his starting pay was set at $20 per hour (doc. 107-11, Gardner dep. 15-16, 35-36).  Carela was hired specifically for his metal finishing experience; he was "considered an expert" in the field and that expertise was needed on-site at BMW (*id.* 36).  According to Gardner's testimony, to get Carela to leave his current job, he was offered starting pay of $20.00 per hour, which matched his pay at 2AM Group, where he was still employed (*id.* 35; doc. 107-6, Gardner aff. ¶ 8).

The plaintiff admits that matching a prospective employee's current pay is a gender-neutral reason for a pay differential (doc. 119 at 13).  The plaintiff also has not disputed that Carela was employed elsewhere being paid $20 per hour when offered employment with the defendant.  The plaintiff argues that "[i]t is significant that in justifying Carela's higher pay, the Defendant denies knowledge of [the plaintiff's] Class A Metal Finishing experience.  By denying knowledge of this experience, the Defendant cannot argue that it compared Carela's Class A metal finishing experience to Plaintiff's and judged Carela's to be somehow superior" (*id.* at 12).  The plaintiff's resume indicated that she was a "stainless steel buffer/resistance welder" at Fisher-Barton from December 2001 to February 2003, and there she "operated an industrial stainless steel buffing machine to remove discoloration from welded truck components for cosmetic purposes" and "inspected the finished product for compliance with company standards" (doc. 107-7, pl. resume).  Neither the plaintiff's resume nor her application indicated that she was a Class A metal finisher (doc. 107-6, Gardner aff. ¶ 10).  The plaintiff testified in her affidavit, however, that during her interview with Gardner, they discussed her "approximately two years of Class A

metal finishing and quality control experience at Fisher Barton and at Aerotek/Inprax" (doc. 119-2, pl. aff. ¶ 1).

Viewing the evidence in a light most favorable to the plaintiff, Carela's resume and application showed his several years of recent metal finishing experience, while the plaintiff had approximately two years of metal finishing experience that occurred more than eight years prior to her hiring by the defendant (doc. 107-2, pl. dep. I 20, 22, 29-30, 35, 44) (stating that her metal finishing experience occurred in 2001-2003). The undersigned finds that the plaintiff has failed to satisfactorily rebut the defendant's evidence that the pay differential between Carela and her was based upon a factor other than sex.

### *Walker*

On August 23, 2011, Walker was offered the second shift team leader position based at BMW with starting pay at $17.00 per hour (doc. 107-6, Gardner aff. ¶ 9; doc. 107-6 at 15-16, Walker offer letter). At the time, Walker's employment application reflected the fact that he was employed at Faurecia Interior Systems, where he had been working since July, 2007 (doc. 107-6, Gardner aff. ¶ 9; doc. 107-6 at 17-18, Walker app.). Walker's employment application indicated his job at Faurecia was the assembly of seats for BMW and that he was "responsible for quality and craftsmanship" (doc. 107-6, Gardner aff. ¶ 9; doc. 107-6 at 17-18, Walker app.). In addition, Walker's application indicated that he had many years of quality inspection and supervisory experience (doc. 107-11, Gardner dep. 43-44; doc. 107-6 at 17-18, Walker app.). That experience included, starting March 2005 through the date of his application (July 31, 2011), service in the U.S. Air Force Reserve as an aircraft hydraulic supervisor, which involved "troubleshoots, repairs, inspects, overhauls and installs [on] aircraft hydraulic system components" (doc. 107-6 at 18, Walker app.). Based on Walker's skills, experience, and the fact that he was then employed at Faurecia, he was offered starting pay at $17 per hour (doc. 107-6, Gardner aff. ¶ 9).

16

Based upon the foregoing, the undersigned finds that the plaintiff has failed to satisfactorily rebut the defendant's evidence that the pay differential between Walker and her was based upon a factor other than sex.

### ***Desch***

The plaintiff cannot establish a *prima facie* case for her third comparator, Jeff Desch, because the evidence before the court shows that he held a different position with different working conditions than the plaintiff.   Furthermore, when Desch began his employment in October 2009 as a team leader at the defendant's Taylor, Michigan facility, his starting pay was $13.00 per hour, or $3.00 per hour less than the plaintiff's starting pay (doc. 107-6, Gardner aff. ¶ 3; doc. 107-6 at 6-7, Desch offer letter).  Desch was temporarily assigned in the summer of 2011 to provide temporary launch support for commencing the defendant's South Carolina operations (doc. 107-6, Gardner aff. ¶ 3).  Before commencing that assignment, Desch had been working on-site for almost two years at one of the defendant's customers in Chicago (*id*.).  At the time of his temporary assignment, Desch was paid $16.40 per hour (doc. 107-11, Gardner dep. 20).  The plaintiff worked with Desch for two weeks (doc. 107-3, pl. dep. II 92).  Desch worked at the BMW facility temporarily for approximately five months and was then assigned to the defendant's Chattanooga, Tennessee operations (doc. 107-6, Gardner aff. ¶ 3).  The defendant has presented evidence that Desch performed different work than the plaintiff, providing launch support for the entire operations rather than supervising one team of inspectors, and he already had more than two years of experience with the defendant (*id*.; doc. 107-11, Gardner dep. 20-21).

The plaintiff states in her affidavit that Desch "provided no other duties besides the same team lead duties that I was doing" and "[a]t BMW he performed the same [t]eam [l]ead [d]uties I performed" (doc. 119-2, pl. aff. ¶ 25).  As discussed above with regard to the defendant's motion to strike, this is exactly the sort of bald assertion about her

17

"qualifications and the deficiencies of her colleagues" that the court struck from the plaintiff's affidavit in *Evans*. 80 F.3d at 959.  Even if the statement is considered, it is too vague and conclusory to create a genuine issue of material fact.  Further, in her opposition to the motion for summary judgment, the plaintiff argues that "[b]eginning in September, [Desch] was paid approximately $21.00 per hour" (doc. 119 at 5).  The plaintiff cites the deposition of Gardner[2] at pages 38-40.  However, Gardner's deposition testimony that is included as an exhibit by the plaintiff does not include the cited pages (*see* doc. 119-3, Gardner dep.).  Furthermore, the earnings information included by the plaintiff as an exhibit to Gardner's deposition shows that Desch's pay went from $16.40 per hour to $19.23 in September 2011 (totaling $40,000.00 per year) (doc. 119-3 at 29, Desch earnings).  Gardner's deposition testimony that is included as an exhibit by the defendant shows that Gardner gave Desch a promotion to a salary position making $40,000.00 per year (doc. 107-11, Gardner dep. 21).  When asked whether Desch "continued to function as a team lead when he was paid $40,000 a year," Gardner responded, "He was then a customer support manager and moved to a different location[,] Chattanooga, Tennessee" (*id.*)

Based upon the foregoing, the undersigned finds that the plaintiff's EPA claim fails because: (1) the evidence shows that Desch's starting pay as a team leader was $3.00 less than the plaintiff's starting pay, (2) the plaintiff has not shown that Desch was performing "work substantially equal in skill, effort, and responsibility under similar working conditions," and (3) the evidence shows Desch had significantly more experience with the

---

[2]  The plaintiff actually cites the deposition of "Ian Moore," which is apparently a typographical error as the cite also references "Exhibit C," which is Gardner's deposition (*see* doc. 119-3).

defendant at the time of the plaintiff's comparison, and therefore she has not rebutted the defendant's evidence that Desch was paid more based on a factor other than sex.[3]

Based upon the foregoing, as no issues of material fact remain, summary judgment should be granted to the defendant on the plaintiff's first cause of action.

### Retaliation

The plaintiff alleges in her fourth cause of action that the defendant retaliated against her for exercising her rights under the EPA (doc. 70, 2nd amend. comp. ¶¶ 27-49). To establish a *prima facie* case of retaliation, the plaintiff must show: (1) she engaged in a protected activity; (2) the defendant took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir. 2004). If the plaintiff establishes a *prima facie* case, the defendant can rebut the presumption of retaliation by articulating a legitimate non-retaliatory reason for its actions. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003). The plaintiff must then show that the proffered reason is a pretext for retaliation. *Id*. "The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001).

The plaintiff engaged in protected activity by filing this lawsuit against the defendant in state court on January 22, 2013. In October 2013, the plaintiff was placed on paid administrative leave by the defendant and was reassigned from BMW to the warehouse after BMW deactivated her access badge. In November 2013, the plaintiff received two written warnings, and in January 2014, she received a written warning and three day suspension. On July 23, 2014, she received a notice of temporary layoff. The

---

[3] As of October 2011, Desch had been employed by the defendant for two years compared with the plaintiff's five months working for the defendant through a temporary agency.

undersigned finds that the plaintiff has shown that one or more of these events were adverse employment actions that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). However, as will be discussed below, the undersigned finds that the plaintiff has not shown a causal connection between her protected activity and the adverse action[s], and, even if she did make such a showing, she has not shown that the defendant's proffered reasons for the adverse actions were pretext for retaliation.

"A causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (emphasis added). A delay between the filing of the suit and the alleged retaliatory act disproves any causal connection. *Pepper v. Precision Valve Corp.*, 526 F. App'x. 335, 337 (4th Cir. 2013) (termination ten months after filing lawsuit negates causal connection). The plaintiff alleges in her amended complaint that the retaliation against her began in September 2013 (doc. 70, 2nd amend. comp. ¶ 30). Notably, however, the first acts of retaliation described by the plaintiff in her amended complaint are her transfer from BMW to the warehouse and her two week suspension, which began on October 23, 2013. Nonetheless, accepting as true the plaintiff's allegation that the retaliation against her began in September, more than eight months had passed since she filed the lawsuit against the defendant. Furthermore, the other alleged retaliatory acts occurred between ten months and nineteen months after the plaintiff filed her lawsuit.

In her response in opposition to the motion for summary judgment, the plaintiff concedes she "cannot use temporal proximity to establish a causal connection between her protected activity and the adverse actions" but instead "has introduced direct evidence of Defendant's animus," which consists of Wade Moore's deposition testimony (doc. 119 at 15).

20

> The Fourth Circuit has held that "direct evidence" is "evidence that the employer 'announced, admitted, or otherwise unmistakably indicated that [the forbidden consideration] was a determining factor' " in the challenged conduct. *Stover v. Lincoln Pub., Inc.*, 73 F.3d 358 (4th Cir.1995) (quoting *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir.1982)); *see also Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir.2006). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Young–Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir.2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

*Wilcoxon v. DECO Recovery Mgmt., LLC*, 925 F.Supp.2d 725, 729 (D. Md. 2013).

The plaintiff states that "Michelle Romick, Ian Gardner and Brian Diphus all indicated a desire to terminate Plaintiff's employment," but she does not indicate when they expressed that "desire."   While Moore testified in his deposition that he "didn't follow instructions on Rosalia Choice to get her terminated," upon questioning, Moore testified that no one ever told him to do anything to get the plaintiff fired (doc. 119-4, Moore dep. 34-35). Moore testified that Romick called him to ask if the plaintiff was on time for work and that Gardner and Donald Hern said that the plaintiff "was a fucking virus" (*id.*).   "Courts in this circuit have widely recognized that stray comments cannot alone constitute evidence of discrimination unless they are related to the employment decision at issue." *Addison v. CMH Homes, Inc.*, C.A. No. 3:12-cv-420-JFA, 2014 WL 4700644, at *7 (D.S.C. Sept. 18, 2014) (Title VII case) (citations omitted).  As argued by the defendant, Moore's testimony does not connect the alleged statements to any of the allegedly retaliatory acts, and he does not provide any dates for their occurrence.  Accordingly, such evidence is not "direct evidence" "sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Wilcoxon*, 925 F.Supp.2d at 729 (citation omitted).

Furthermore, even assuming the plaintiff could establish a *prima facie* case of retaliation, the defendant has articulated, nondiscriminatory reasons for each of the allegedly retaliatory employment actions.  Thus, the plaintiff must establish that the given reasons were pretext for retaliation.

### *Warehouse Reassignment*

With regard to her reassignment to the warehouse in October 2013, the plaintiff has not disputed that, while assigned to BMW, she recorded conversations wth Carela, and she sent one such recording to her supervisor, Joe Scruggs, on October 18, 2013 (doc. 107-3, pl. dep. II 142-44).  The plaintiff admitted in her deposition that she recorded the telephone conversation with Carela while he was working inside at BMW and while she was in BMW's parking lot (*id.* 143; doc. 107-4, pl. dep. III 77).  The plaintiff also testified that she "possibly" made some of the one hundred recordings she produced to the defendant while she was onsite at BMW (doc. 107-3, pl. dep. II 144-45).  The plaintiff also does not dispute that BMW deactivated her access badge for its facility after discovering that she was recording conversations.  The plaintiff stated that she believed this was retaliatory because "Joe Scruggs took that information to BMW human resources department" (*id.* 144).  According to Gardner's testimony, he was in favor of having the plaintiff transferred from BMW to the warehouse to avoid "any further policy violations to affect our customer and put our business at risk" (doc. 107-11, Gardner dep. 164).  The plaintiff does not dispute that she and Carela were informed in August 2013 that BMW expected that they must conduct themselves professionally and get along while working in its facility (doc. 107-6, Gardner aff. ¶ 12).  The plaintiff's conduct was contrary to that expectation.  The plaintiff also acknowledged that, regardless of whether the defendant notified BMW that she was recording conversations, if BMW did not want her onsite, she could not work there (doc. 107-4, pl. dep. III 117-18).  She further acknowledged that the defendant could have terminated her after BMW deactivated her badge, but instead

22

reassigned her to its warehouse without any change in her job title, pay, and benefits (*id*. 155).

The plaintiff also claims that the defendant retaliated against her by moving her from third to first shift as a result of her warehouse reassignment (doc. 119 at 8). However, as argued by the defendant, the plaintiff has failed to offer any support for her argument that the defendant was required to permanently accommodate her shift preference, and she has not offered evidence of any comparable who was so accommodated.

Based upon the foregoing, the plaintiff has failed to show that the reason given for her reassignment to the warehouse was pretextual.

### ***Written Warnings***

The plaintiff believes that the written warning for her poor attendance received in November 2013 was an act of retaliation (doc. 107-4, pl. dep. III 120-21). It is undisputed that two days after beginning her assignment at the defendant's warehouse, the plaintiff was absent from work on November 8, 2013, because her daughter's truck "broke down" (*id*. 121-22). The defendant's warehouse manager, Sparks, issued the plaintiff a written reprimand on that date for being absent six times during the preceding six weeks (doc. 107-4, pl. dep. III. 120; doc. 107-13, Sparks aff. ¶¶ 7-8; doc. 107-13 at 7, reprimand). The defendant's attendance and punctuality policy states that "[r]egular attendance is an important aspect to running a successful business," and it is expected that "employees will make every effort to be at work when scheduled" (doc. 107-10 at 11). It further provides that when an employee accumulates six attendance points, a written warning is issued, and "employees exhibiting repeated unfavorable attendance patterns" will be subject to discipline, "up to and including termination, regardless of point balance" (*id*. at 12; doc. 107-13, Sparks aff. ¶ 8).

The plaintiff testified in her affidavit that the other five cited absences were for days she was scheduled to be off, she did not call in on those days, and the call-ins cited in the reprimand were fabricated (doc. 119-2, pl. aff. ¶ 10). However, as noted by the defendant, this statement is contradicted by the plaintiff's deposition testimony that she called in on October 1, 2013, because she struck a deer with her car and on October 9, 2013, because her daughter was in an accident (doc. 107-4, pl. dep. III 124-26; doc. 107-13 at 7, reprimand). The plaintiff further claims that even if the five scheduled days off had been actual absences, she should have been given a verbal warning after four absences, rather than a written reprimand (doc. 119-2, pl. aff. ¶ 12). However, the plaintiff has not identified any comparable treated more favorably than her.

The plaintiff also claims that the written warning she received for insubordination and disrespectful conduct on November 26, 2013, was retaliatory (doc. 107-4, pl. dep. III 138-39). The defendant has given a legitimate non-retaliatory reason for issuing that written warning. Specifically, Sparks testified in his affidavit that on November 15, 2013, he met with the plaintiff to explain her team leader responsibilities and expectations for the Benteler bumper repack, including that she must work with her team repacking the bumpers just like the other warehouse team leaders (doc. 107-13, Sparks aff. ¶ 9). In response, the plaintiff stated she did not have to perform that work (*id.*). Sparks also explained the break procedure because the plaintiff was seen sitting down reading the newspaper on the warehouse floor (*id.*). He told her that a break room was available where she could read the newspaper while on break (*id.*). Sparks testified that while he spoke, the plaintiff took out her cell phone and started doing something with it (*id.*; doc. 107-4, pl. dep. III 143-44). According to Sparks, the plaintiff then twice ignored his instructions to put away her cell phone and began yelling at him and continued yelling at him as he instructed her to return to work (doc. 107-13, Sparks aff. ¶ 9).

24

The plaintiff agrees that Sparks "repeatedly expressed to [her] that [she] was supposed to be packing parts" (doc. 107-4, pl. dep. III 143). However, she claims that he approached her with "an attitude," stating that he had taken a picture of her sitting down and reading the newspaper (*id.*). The plaintiff claims Sparks told her that she was only allowed to take her break in the break room, and when she asked why she was the only one who could only take a break in the break room, Sparks "became irate, yelling" (*id.* 143-44). The plaintiff testified that she took out her phone and, while her "first instinct was to call the police," she instead called Wade Moore, who was her regional supervisor, and Michelle Romick (*id.*). The plaintiff does not dispute that she refused to put her telephone away after being instructed to do so, that she "may have gotten a little upset," or that "it is possible" she may have raised her voice with Sparks (*id.* 174-75; doc. 119-2, pl. aff. ¶¶ 13-14).

The defendant's Employee Conduct and Work Rules policy provides that acts of insubordination or other disrespectful conduct are subject to disciplinary action up to and including termination (doc. 107-10 at 11; doc. 107-13, Sparks aff. ¶ 10). The plaintiff admits that, even after filing her lawsuit, she was subject to the defendant's policies and work rules, and if she violated those rules, discipline would be appropriate (doc. 107-4, pl. dep. III 56-57). The plaintiff has failed to identify any comparables who engaged in similar conduct and were not disciplined. The plaintiff states in her affidavit that "others regularly used phones in the facility" and were allowed to take their breaks outside the break room (doc. 119-2, pl. aff. ¶ 14). The undersigned has recommended that the statements be stricken. However, even if the statements are considered by the court, such statements made without specific evidentiary support are too vague and conclusory to create a genuine issue of material fact. *Brown*, 196 F. App'x at 182. Based on the foregoing, the plaintiff has failed to establish pretext with regard to these written warnings

### *Suspension*

The plaintiff also claims that her three-day suspension in January 2014 was issued in retaliation for filing her EPA claim (doc. 107-4, pl. dep. 194-95). The defendant has given a legitimate, nondiscriminatory reason for suspending the plaintiff. On January 3, 2014, Sparks requested that the plaintiff report to work (doc. 107-4, pl. dep. III 195). The plaintiff initially told Sparks via text message that she would report around 8 a.m., but then changed the time to 10 a.m. (*id.* 195-96; doc. 107-13, Sparks aff. ¶ 11). When the plaintiff did not show up at 10:00 a.m., Sparks called her at 11:30 a.m. to ask about her whereabouts and why she had not reported (doc. 107-13, Sparks aff. ¶ 11). The plaintiff explained that she called the customer to check whether there were any bumpers for her to pack that day (*id.*; doc. 107-4, pl. dep. III 197-98), and, based on her conversation with the customer, she decided there was not enough work for her to justify reporting to work (doc. 107-13, Sparks aff. ¶ 11; doc. 107-4, pl. dep. III 197-99). The plaintiff admits that she did this without Sparks' knowledge or approval (doc. 119-2, pl. aff. ¶ 17). The plaintiff also admits that she got a "little irate" with Sparks and hung up on him (doc. 107-4, pl. dep. 197-99). The plaintiff does not dispute that she refused to come to work after being told to do so by Sparks (doc. 119-2, pl. aff. ¶ 17). Sparks suspended the plaintiff for three days without pay on January 15, 2014, for this incident(doc. 107-13 at 13, suspension).

The plaintiff testified in her affidavit that "it was common for employees to call in and announce that they would not be coming into work despite being scheduled" (doc. 119-2, pl. aff. ¶ 19). As discussed above, this statement should be stricken, but, even if it is considered by the court, such a statement made without specific evidentiary support is too vague and conclusory to create a genuine issue of material fact. *Brown*, 196 F. App'x at 182. Based upon the evidence before this court, the plaintiff has failed to show that the reason given for her suspension was pretext for retaliation.

### *Layoff*

Although the plaintiff admittedly does not know who made the decision, she alleges that her temporary layoff in July 2014 was in retaliation for filing this lawsuit, which was filed 17 months earlier (doc. 107-5, pl. dep. IV 5).  The plaintiff has not disputed the defendant's evidence showing that the number of bumpers being packed for Benteler had declined from 25 to 30 racks of bumpers per day, to 2 to 3 racks of bumpers per day (doc. 107-14, Evert dep. 8-9; doc. 107-13, Sparks aff. ¶ 15).  She also has not disputed the defendant's evidence that, as a result of that decline in business, all of the temporary employees who worked with the plaintiff on the Benteler job had been let go prior to the plaintiff's layoff (doc. 107-13, Sparks aff. ¶ 15).  Based upon the foregoing, the plaintiff has failed to establish that the reason given for her layoff was pretext for retaliation.

### *Fair Labor Standards Act and South Carolina Payment of Wages Act*

In her second and third causes of action in the second amended complaint (doc. 70), the plaintiff alleges that she was not paid for overtime in violation of the FLSA and SCPWA.  The plaintiff has offered no arguments or evidence in opposition to the defendant's motion for summary judgment on these claims.  Accordingly, summary judgment should be granted to the defendant because the plaintiff has failed to present any evidence that she was not paid for overtime she worked for the defendant (*see* doc. 107-1 at 22-25).

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment (doc. 107) be granted and the motion to strike portions of the plaintiff's affidavit (doc. 124) be granted in part and denied in part.  Should the district judge adopt this recommendation, any pending nondispositive motions will be rendered moot.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

March 18, 2015
Greenville, South Carolina